Joseph W. ACCARDI, Theresa Apice, George L. Barnwell, Herby L. Bryant, Carmine A. Cipriano, Alfred A. De Leo, Ronald De Meo, Joseph Duggan, Evelyn F. Ernst, Roy L. Garland, Anthony V. Palmisano, John J. Sheridan, Ralph E. Visconti, Eduardo F. Gutierrez, Joseph S. Tralongo, Ann C. Venturino, Plaintiffs,

v.

CONTROL DATA CORPORATION, Defendant.

No. 85 Civ. 9554 (WK).

United States District Court, S.D. New York.

May 1, 1987.

Purrington, McConnell & Agus, New York City, for plaintiffs; Stephen A. Agus, Selina G. Ericson, of counsel.

Oppenheimer, Wolff & Donnelly, New York City, for defendant; W. Herbert Plummer, Joseph J. Vicinanza, W. Christopher Jones, of counsel.

## MEMORANDUM AND ORDER

WHITMAN KNAPP, District Judge.

Plaintiffs in this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seek severance pay from their former employer due to the sale of the division in which they worked to another company. Defendant Control Data Corporation ("CDC") moves for summary judgment pursuant to Fed.R. Civ.P. 56. For the reasons which follow, we deny defendant's motion and grant summary judgment to the plaintiffs.

### FACTS

Prior to January 12, 1973, all 16 plaintiffs were employed by the Service Bureau Corporation ("SBC"), a wholly-owned subsidiary of International Business Machines Corporation ("IBM"). As SBC employees, plaintiffs participated fully in the IBM employee benefits plans. It was "very well known that IBM had one of the best benefit plans available for employees, and had a reputation as one of the most secure places to work as a result of that." (Affidavit of Plaintiff Evelyn Ernst Par. 5).

*The Benefits Agreement*

On January 12, 1973, as part of the settlement of an antitrust action, IBM sold all of SBC's capital stock to defendant. In connection with that sale, defendant, IBM and SBC entered into a "Benefits Agreement" (Pl. Ex. 6) whereby defendant agreed to provide SBC employees with "employee benefit plans substantially the same as, or better than" they were receiving from IBM. Severance pay was one such benefit. Defendant was entitled to provide such employees with its own life insurance benefits and sickness, accident and disability plans on condition that defendant compensate them for any resulting detriment through increases in salary or

other compensation.[1] At the same time, IBM deposited $26 million with the Northwestern National Bank of Minneapolis to fund benefits for SBC employees.

The IBM benefits plan booklet (Pl. Ex. 1) was annexed as an exhibit to the Benefits Agreement. Also annexed was a document called the IBM Manager's Manual containing IBM's severance pay policy. With respect to employees (including plaintiffs) affected by defendant's purchase of SBC, it is not disputed that defendant adopted IBM's severance pay plan.

The parties made the following recognition of IBM's purpose in entering into the Benefits Agreement:

IBM in recognition of the indirect benefits it has received from the services heretofore rendered by the present employees of SBC and to assure the continued loyalty and high morale of its own employees and of the employees of its other direct or indirect subsidiaries desires to enter into this Agreement.

(Benefits Agreement at 1–2).

A total of 1700 employees were involved in the sale of SBC to defendant. Due to their distinct benefit plan, these employees were labelled within CDC as the "SBC–1700." As part of their unique status, SBC employees were not offered any CDC Benefit Plan enhancements or improvements, except for those funded by paycheck deductions (Ernst Aff. Pars. 10, 11).

Subsequent to January 12, 1973, defendant liquidated SBC and transferred certain SBC employees, including plaintiffs, to its Brokerage Transaction Services Division ("BTSI"). Plaintiffs continued to receive all benefits available to them under the Benefits Agreement.

On June 30, 1985, defendant sold BTSI to Automatic Data Processing, Inc. ("ADP"). Plaintiffs were never afforded an opportunity to remain as CDC employees in any capacity, but continued to work for ADP in the same capacity and at the same salary. (Ernst Aff. Pars. 15, 19). Essentially, plaintiffs left their offices as CDC employees on Friday, June 28, 1985 and were informed when they returned to work on Monday, July 1, 1985 that ADP was their new employer, and that their IBM benefits package had terminated (Ernst Aff. Par. 15). It is undisputed that ADP is in no way bound by the Benefits Agreement.

The sixteen Plaintiffs were the only employees covered by the Benefits Agreement who were involved in or in any way affected by the sale of BTSI to ADP. (Ernst Aff. Par. 14).

*IBM's Severance Pay Policies*

IBM's severance pay policy, which was adopted by defendant, is contained in the IBM Manager's Manual ("Manual"), incorporated as an exhibit to the Benefits Agreement. The Manual outlines three classifications of separation from employment (other than death or retirement)—voluntary resignation, mutual agreement resignation and dismissal—and provides the possibility of severance pay for all terminations except voluntary resignation. Voluntary resignation occurs "[w]hen an employee resigns completely of his own accord" or "if the cause for separation is 'Inability to Accept Job Offer-Relocation Manpower Imbalance'" (Manual § H(1)). Mutual agreement resignation occurs "[w]hen the company and the employee agree that the separation is in the best interests of both." According to the Manual, "such separations usually result when assessment by the company and the employee indicates that the employee failed to meet IBM standards of performance" (Manual § H(2)). Dismissal can result "[w]hen an employee does not agree with the company's conclusion that separation is in the best interests of both" (Manual § H(3)).

While separation pay is not an "absolute employee entitlement," the Manual carefully describes the circumstances under which severance pay should be considered to be inappropriate.

No separation allowance should be paid if the cause for dismissal is of such a grave nature that the payment of the

---

1. IBM agreed to maintain a group of benefits (adoption assistance, dental benefits, and cer-tain amendments to the retirement and life insurance plans) at its own expense.

separation allowance would not be warranted, or if the facts conclusively prove that the employee induced IBM to initiate separation in order to receive separation pay.

Manual § I (1.3)

The IBM benefits policy in no way conditions payment of the separation allowance on continued unemployment, although it does require an employee rehired by IBM to return the unused portion of any separation pay (Manual § I (1.3)(a)).

The computation of severance pay is based on the number of months of IBM service.

*Plaintiffs' Demand for Severance Pay*

Immediately following the BTSI sale to ADP, plaintiffs made demands for severance pay, all of which were denied (Pl. Ex. 4). The defendant has offered two explanations for the denial.

First, in a letter to each plaintiff rejecting the demand, defendant analyzed the provisions of the IBM Benefits Agreement and concluded that they did not entitle plaintiffs to severance pay because the IBM plan did not contemplate or address termination if caused by sale of a division. Hence, defendant looked to CDC policy, which specifically prohibits a grant of severance pay when a Control Data unit is sold to a non-Control Data organization. (Control Data Corporation Approved Policy and Procedure on Termination of Employees § 3(C)(2)(f), annexed as Ex. F to Rich Aff.). The letter, in pertinent part, provided:

The benefits described in the Employee Benefit Plan Booklet provided [to] SBC [IBM] employees at the time they were acquired by CDC continued for the duration of employment with CDC. The SBC Benefit Plan, however, does not cover or define separation in a divestiture situation. The three referenced categories of separation are voluntary resignation, mutual agreement resignation and dismissal. Dismissal is intended to cover a

performance-related situation, and depending on the specific circumstances, e.g., misconduct, a severance payment may not be in order. Regardless, the sale of BTSI to ADP is not considered dismissal of employment.

Since the SBC Benefit Plan does not contemplate or address termination as it relates to a divestiture, CDC policy was followed. Severance pay is not an appropriate consideration in a divestiture situation where continuity of employment is provided.

Second, in an affidavit submitted in this proceeding, defendant claims that IBM's severance pay policy was not intended to benefit individuals in plaintiffs' position. The affidavit, so far as here relevant, asserts:

Like most, if not all, severance policies, the separation allowance was available to ease the financial burden for a limited period following termination of employment under certain circumstances ... I determined that because the sixteen plaintiffs have never been unemployed as a result of ADP's acquisition of BTSI and, further, had not sustained any loss of salary, that the language and purpose behind the SBC [IBM] separation allowance did not afford severance benefits to the sixteen plaintiffs.

(Rich Aff. Par. 7).

Plaintiffs subsequently commenced this ERISA action challenging defendant's denial of severance pay as arbitrary and capricious.[2]

## DISCUSSION

This action involves interpretation of the IBM benefits plan, which defendant adopted via the Benefits Agreement. Since the facts are essentially undisputed, all parties agree that summary judgment is appropriate. They also agree that the standard of review governing an employer's decision to grant or deny benefits under an

---

2. In the alternative, the complaint sought a continuation of benefits available under the Benefits Agreement. At oral argument, plaintiffs agreed to abandon this claim should we grant them summary judgment on their severance pay claim.

ERISA plan[3] is whether the decision is "arbitrary and capricious." *Miles v. New York States Teamsters Conference Pension and Retirement Fund Employee Pension Benefit Plan* (2d Cir.) 698 F.2d 593, 599, *cert. denied* (1983) 464 U.S. 829, 104 S.Ct. 105, 78 L.Ed.2d 108.

Although the arbitrary and capricious standard is not a demanding one, neither is it a mere rubber stamp for the Plan Administrator's actions. The ERISA plan must be administered in accordance with the documents and instruments governing the plan. 29 U.S.C. § 1104(a)(1)(D). "Where the trustees of a plan impose a standard not required by the plan's provisions, or interpret the plan in a manner inconsistent with its plain words, or by their interpretation render some provisions of the plan superfluous, their actions may well be found to be arbitrary and capricious." *Miles, supra,* at 599. In other words the terms "arbitrary and capricious" do not describe the employer's subjective attitude but its objective compliance with the plan being administered.

The question here presented is whether the reasons relied upon by defendant for denying plaintiffs severance pay can be deemed anything but "arbitrary and capricious" under the foregoing standard. Our negative answer to this question is based on the conclusion that defendant's analysis of the IBM severance pay policy—which defendant adopted—was clearly erroneous, and defendant's comments about its own policies irrelevant.

Before we turn to an interpretation of the disputed IBM benefits plan, it is important to emphasize that we are dealing with an unusual employer. Many companies—such as the defendant and those corporations who are the subject of the cases it cites to us[4] use severance pay primarily to minimize the financial hardship terminated employees suffer due to unemployment. However, the purpose of IBM's separation pay, as reflected in the Benefits Agreement and benefits plan booklet, was quite different. Apparently, IBM has concluded that the surest way to retain loyal and experienced employees, and to maintain high morale, is to provide security for its workers in the form of continued benefits when the company undergoes organizational changes. Indeed, the introduction to the Benefits Agreement with the defendant recites that IBM's motivation in making such a contract was to "assure the continued loyalty and high morale of [IBM's] own employees," who presumably relied on IBM's carefully cultivated reputation for security and superior fringe benefits. In order to demonstrate concern for its continuing employees, and to quiet any fears stemming from the SBC sale, IBM rewarded the SBC employees—who were not in any way threatened by financial hardship resulting from unemployment—for their prior services by protecting their benefits. This contract provided, among other things, for IBM's contribution of a $26 million fund to insure the contemplated benefits.

With these considerations in mind, we turn to the interpretation of the IBM severance pay policy which defendant adopted. The issue is whether plaintiffs would have been entitled to severance pay had they been terminated by IBM in the circumstances here at issue. The answer is clearly yes. Defendant's principal contention is that plaintiffs' demands for severance pay were properly denied because IBM's bene-

3. The employee benefit plan described in the Benefits Agreement is an "employee welfare benefit plan" within the meaning of ERISA. 29 U.S.C. § 1002(1). The ERISA plan consists of the Benefits Agreement and the attached exhibits, including the IBM benefits plan booklet and the IBM Manager's Manual.

4. Defendants have cited several decisions upholding the decisions of employers who denied severance pay to employees when their division was sold. *Holland v. Burlington Industries* (4th Cir.) 772 F.2d 1140, *aff'd mem. sub nom., Brooks v. Burlington Industries* (1986) —— U.S. ——, 106 S.Ct. 3267, 91 L.Ed.2d 562; *Sly v. P.R. Mallory & Co.,* (7th Cir.1983) 712 F.2d 1209; *Pabst Brewing Co. v. Anger* (D.Minn.) 610 F.Supp. 214, *aff'd* (8th Cir.1986) 784 F.2d 338; *DeAngelis v. Warner Lambert Co.* (S.D.N.Y.1986) 641 F.Supp. 467; *Ausloos v. Chromalloy American Corp.* (E.D. Wis. 1986) 626 F.Supp. 324. However, these cases all involve other employee benefit contracts, and not the peculiar provisions we have before us.

fit plan does not address termination due to the sale of a division. In our view, this conclusion was inconsistent with the plan's provisions, and, hence, arbitrary and capricious. Since we can look only to the provisions in IBM's benefits plan, it follows that the application of defendant's own policy was irrelevant.

At the outset we note that plaintiffs' separation from defendant constituted "dismissals" under the plain words of the IBM benefits plan. They obviously did not agree with the defendant's conclusion that separation was in the best interests of both.

We next dispose of defendant's argument that IBM's severance pay policies do not address the sale of a division. Defendant apparently saw in the IBM Manager's Manual three categories of separation from employment, and then proceeded to search for a fourth heading entitled "sale of a division." When it failed to find such a category, it erroneously concluded that the IBM benefits plan did not address termination in a divestiture situation. However, IBM, a multinational corporation, is represented by some of the most sophisticated lawyers in the country. It is hardly likely that these highly competent attorneys did not contemplate, and simply neglected to provide for, the possibility that IBM might, at some future date, sell one of its divisions to another company. We therefore must conclude that they omitted any mention of such possibility because they deemed the three categories set forth in the plan to be self explanatory, and discussion of further possibilities superfluous.

Were there any doubt on the question, we would look to see how IBM had acted in prior similar situations. *See, DeAngelis v. Warner Lambert Co.* (S.D.N.Y.1986) 641 F.Supp. 467, 470 and cases cited. We would not have far to look. As we have already noted, the very contract upon which this lawsuit is based—including, among other provisions, an IBM deposit of $26 million—was created for the very pur-

pose of protecting the benefits (including severance pay) of employees who were being dismissed from IBM as a result of the sale of a division. These actions leave no doubt about IBM's conception of its obligations in the event of the sale of a division: employees either must be fully protected or must receive severance pay.[5]

Having determined that the IBM benefits plan does indeed encompass sale of a division, we next ask whether there is any other reason under the plan why severance pay should be denied. We look to the words the IBM Manager's Manual uses to describe situations where severance pay should not be awarded: when the cause of separation is of such a "grave nature" as to make a separation allowance inappropriate, or where it is conclusively established "that the employee induced IBM to initiate separation in order to receive severance pay." As there is no suggestion that either situation occurred here, we can find no basis in the IBM benefits plan for denying plaintiffs' demands for severance pay.

In short, there can be no doubt that the IBM benefit plan provides severance pay for employees forced out of IBM's employment by the sale of a division.

Nor is there any merit in defendant's further contention that plaintiffs should be denied severance pay because they did not suffer the financial hardship of unemployment. In the first place, the above quoted criteria for denial of severance pay do not mention unemployment as a factor. Secondly, by providing that employees rehired by IBM must return the unused portion of any separation pay, the plan clearly indicates that those finding work elsewhere get their severance allowance free and clear. Thirdly, as we have already discussed, the concept that financial hardship need be established to entitle one to severance pay is foreign to the basic philosophy underlying IBM's employment policies. The purpose expressed in the Benefits Agreement was to reward SBC employees

---

**5.** Defendant points out that at the time IBM sold SBC to defendant, IBM did not grant severance pay to SBC employees. However, IBM instead entered into a contract with defendant to insure the departing employees that they would receive severance pay at a future time (such as this one) should they ever be separated from IBM's overall package of benefits.

for their past services and to assure the continued loyalty and high morale of other IBM employees who relied upon IBM's unique reputation for security.

Defendant further contends that awarding severance benefits to plaintiffs would constitute a windfall double recovery, since they would receive both salary from ADP and severance pay. The short answer to that contention is, as already noted, that the IBM plan specifically provides for such double recovery unless the dismissed employee is rehired by IBM itself.

In addition, defendant asserts, plaintiffs currently enjoy a severance pay program with ADP, and would therefore collect twice should they be terminated by ADP in the future. However, as defendant concedes, ADP is not contractually bound to maintain any benefits for plaintiffs, and can alter, diminish or eliminate them at any time.[6]

Finally, defendant's interpretation would render the Benefits Agreement nugatory. *See, Miles, supra,* at 599. The contract was intended to provide continued security to SBC employees. Yet, defendant's interpretation would permit defendant to escape its obligation to provide benefits to plaintiffs by selling off SBC immediately after acquisition, so long as plaintiffs continued to work for the purchasing entity.

In summary, it is crystal clear that plaintiffs would have received severance pay had they been terminated by IBM in the circumstances here at issue. It being the declared purpose of the Benefits Agreement into which defendant entered with IBM to assure that plaintiffs' benefits would at all times be "the same as or better than" they would have been had plaintiffs remained in IBM's employ, defendant's own—and less favorable—policies are wholly irrelevant. It follows that the denial of severance pay must be found to have been arbitrary and capricious.

Summary judgment on the first cause of action is granted to plaintiffs; the remaining claims are dismissed. Let plaintiffs submit an appropriate judgment on ten days notice.

SO ORDERED.

---

**6.** After oral argument, we requested that the parties submit a joint statement detailing what, if any, difference exists between the dollar value of all fringe benefits (excluding severance pay) to which plaintiffs were entitled under the IBM benefits plan and the dollar value of such benefits under the ADP plan. If the parties could not agree, each party was to submit its own estimate. As is apparent from the voluminous responses we received, it was impossible for the parties to comply with our request. On further reflection, however, our initial question became immaterial.